IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Paul David Tint, | ) | C/A No.: 1:15-1996-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

A.    Procedural History

On October 20, 2011, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on June 9, 2011. Tr. at 89, 97, 159–65, 166–76. His applications were denied initially and upon reconsideration. Tr. at 133–37, 143–44, 145–

46. On October 9, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") John S. Lamb. Tr. at 24–55 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 10, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–23. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 13, 2015. [ECF No. 1].

      B.     Plaintiff's Background and Medical History

          1.     Background

Plaintiff was 32 years old at the time of the hearing. Tr. at 29. He obtained a general equivalency diploma ("GED"). *Id.* His past relevant work ("PRW") was as a cook's helper. Tr. at 51. He alleges he has been unable to work since June 9, 2011. Tr. at 89.

          2.     Medical History

Plaintiff presented to Charles V. Mullen, M.D. ("Dr. Mullen"), at Palmetto Pulmonary & Critical Care Associates on October 6, 2008. Tr. 302–05. He complained of anterior chest pain that Dr. Mullen indicated was likely related to costochondritis. Tr. at 302. Dr. Mullen noted that a CT scan showed bullous changes that were consistent with emphysema. *Id.* He observed no abnormalities on examination. Tr. at 303–04.

On March 12, 2009, Plaintiff complained to Dr. Mullen of chest pain that was exacerbated by a recent chest infection. Tr. at 298. He reported a daily cough and some

dyspnea on exertion. *Id.* He indicated he had tried to stop smoking with Chantix, but discontinued the medication because of nausea. *Id.* Dr. Mullen noted no abnormalities on examination. Tr. at 299–300. Plaintiff underwent a complete pulmonary function study, which showed normal spirometry and lung volumes, but decreased diffusion capacity consistent with emphysema. Tr. at 296, 300. Dr. Mullen referred Plaintiff to a rheumatologist, recommended a nicotine patch for smoking cessation, and prescribed Spiriva. Tr. at 300–01.

On May 4, 2009, Plaintiff presented to Scott Weikle, M.D. ("Dr. Weikle"), with a complaint of anxiety. Tr. at 362. He stated his anxiety had been occurring for months, but was exacerbated by the recent death of a baby cousin. *Id.* He indicated his mind was racing and that he was experiencing chest pain and shortness of breath. *Id.* He endorsed symptoms that included anxiety, depression, fearfulness, inability to concentrate, changes in mood, and panic attacks. *Id.* Dr. Weikle observed Plaintiff to be anxious and alert, but well-groomed. *Id.* He noted Plaintiff could articulate well and demonstrated normal speech and language. Tr. at 363. He indicated Plaintiff had normal thought content and could perform basic computations and apply abstract reasoning. *Id.* He saw no evidence of hallucinations, delusions, obsessions, or homicidal or suicidal ideation. *Id.* He indicated Plaintiff showed appropriate judgment and insight; was able to recall recent and remote events; and had a normal attention span and ability to concentrate. *Id.* Dr. Weikle diagnosed adjustment disorder with anxiety and prescribed Trazodone and Ativan. *Id.*

Plaintiff followed up with Dr. Weikle on July 20, 2009, and reported a recent episode of numbness in his arms, legs, and lips. Tr. at 364. He indicated the numbness

3

resolved after he fell asleep, but that he continued to experience some dizziness. *Id.* Plaintiff reported anxiety, depression, and panic attacks. *Id.* Dr. Weikle described Plaintiff's mood and affect as anxious, but noted that his mental status was otherwise normal. Tr. at 365. He noted that Plaintiff's adjustment disorder with anxiety was "SOMEWHAT BETTER" and diagnosed depressive disorder. *Id.*

Plaintiff presented to Greenville Memorial Medical Center with chest pain on August 24, 2009. Tr. at 309. An x-ray showed no acute abnormalities. Tr. at 313. Plaintiff was diagnosed with anterior chest wall pain. Tr. at 311. He followed up with Dr. Weikle on August 31, 2009. Tr. at 366. He indicated he had moderate-to-severe sharp and stabbing pain on his sternum that was precipitated by shoulder movement, local pressure, and deep breathing. Tr. at 366. Dr. Weikle indicated Plaintiff was tender to palpation in his bilateral anterior chest walls and had decreased breath sounds in both lung fields. Tr. at 366. He indicated Plaintiff's mood and affect were anxious, but that his mental status was otherwise normal. Tr. at 367. He diagnosed a rib strain or sprain and noted that it was "probably costochondritis." *Id.* He stated he would not treat a 27-year-old with chronic narcotics, and indicated he would try Relafen and steroid and Toradol shots. *Id.* He encouraged Plaintiff to stop smoking and stated "THIS IS VERY KEY FOR ANY LUNG DISORDER PREVENTION." *Id.*

Plaintiff again complained of chest pain on September 21, 2009. Tr. at 368. He indicated that he had experienced numbness in his hands that caused him to miss several days of work. *Id.* Dr. Weikle observed tenderness to palpation in Plaintiff's bilateral anterior chest walls and decreased breath sounds in both lung fields. *Id.* He indicated

Plaintiff had an anxious mood and affect, but his neuropsychiatric examination was otherwise normal. *Id.* Dr. Weikle noted Plaintiff's adjustment disorder had improved with Trazodone. Tr. at 369. He administered injections for emphysema and prescribed a nicotine patch. *Id.*

On September 25, 2009, a computed tomography ("CT") scan showed a large bullous lesion at Plaintiff's right lung apex. Tr. at 343.

Plaintiff presented to Dr. Weikle with neck pain and stiffness on October 27, 2009, after falling down a couple of steps. Tr. at 370. Dr. Weikle observed tenderness in Plaintiff's paracervical area, around C5-6, and in his right upper trapezius area. *Id.* He diagnosed a muscle spasm, referred Plaintiff for an x-ray of his cervical spine, and prescribed Darvocet and Flexeril. Tr. at 371.

State agency consultant Robbie Ronin, Ph. D., reviewed the record and completed a psychiatric review technique form ("PRTF") on December 17, 2009. Tr. at 374–87. He found that Plaintiff's mental impairments were not severe. Tr. at 374.

On December 17, 2009, state agency medical consultant Seham El-Ibiary, M.D., reviewed the record and completed a physical residual functional capacity ("RFC") assessment. Tr. at 388–95. He found Plaintiff could perform work that required he occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday, but must avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc. *Id.*

On June 13, 2011, Plaintiff presented to North Greenville Hospital with pleuritic chest pain and a cough. Tr. at 415. He indicated the right upper quadrant of his chest was painful with movement, palpation, and breathing. Tr. at 415. A nurse's note indicated Plaintiff rested quietly in the room until she entered and then began to hold his chest, groan, and request pain medication. Tr. at 419. The nurse indicated she informed Plaintiff that no pain medication could be dispensed without a diagnosis and that Plaintiff became emotional and indicated he was going to leave. *Id.* Jeffrey Leshman, M.D., entered the room shortly thereafter and observed moderate tenderness in Plaintiff's posterior right chest. Tr. at 416. He diagnosed chest wall pain, prescribed Lortab, and discharged Plaintiff. Tr. at 423.

Plaintiff presented to B. Rhett Myers, M.D. ("Dr. Myers"), for a psychiatric evaluation on July 28, 2011. Tr. at 451. Dr. Myers indicated Plaintiff was dressed casually and had a fairly normal affect and a positive mood. *Id.* He described Plaintiff as oriented to time, place, person, and situation. *Id.* He noted Plaintiff's thoughts were goal-directed and that he had no hallucinations, delusions, or suicidal or homicidal thoughts. *Id.* He described Plaintiff as having fair memory and concentration, average intelligence, and adequate insight. *Id.* He diagnosed major depressive disorder; anxiety disorder, not otherwise specified ("NOS"); and attention deficit disorder with hyperactivity ("ADHD"). *Id.* He assessed a global assessment of functioning score of 65; prescribed Prozac, Xanax, Restoril, Risperidone, and Adderall; and instructed Plaintiff to follow up

in two months. Tr. at 451–52. Plaintiff followed up with Dr. Myers on August 12, 2011, and generally reported doing well.[1] Tr. at 450.

Plaintiff presented to North Greenville Hospital on November 7, 2011, with a complaint of rib pain. Tr. at 398. He indicated he was injured when a freezer fell onto his left side. *Id.* Nadim Salman, M.D. ("Dr. Salman"), observed Plaintiff to have anterior tenderness in his left chest. Tr. at 399. A chest x-ray showed no fracture or other abnormality. Tr. at 400. Plaintiff complained of shortness of breath, but his oxygen saturation was 100 percent on room air and he had clear breath sounds. *Id.* Dr. Salman diagnosed a rib contusion and directed the nurse to administer 400 milligrams of Ibuprofen. Tr. at 399, 400. Plaintiff refused to take the Ibuprofen and "was seen storming out of ER" before receiving discharge instructions. Tr. at 400–01.

On November 30, 2011, state agency consultant Craig Horn, Ph. D., reviewed the record and determined Plaintiff had no medically-determinable mental impairment. Tr. at 93.

On December 6, 2011, Plaintiff indicated to Dr. Myers that he stopped taking Prozac because of sexual side effects. Tr. at 449. Dr. Myers prescribed Celexa. *Id.*

On December 13, 2011, state agency medical consultant Matthew Fox, M.D., assessed Plaintiff's physical impairments as non-severe. Tr. at 94.

Plaintiff presented to New Horizon Family Health Services with a complaint of congestion on February 14, 2012. Tr. at 436. Plaintiff indicated he continued to smoke

---

[1] Dr. Myers's treatment notes from this visit and several subsequent visits are handwritten, lack detail, and are difficult to decipher. *See* Tr. at 448–50, 453–54.

one pack of cigarettes per day. *Id.* The provider noted that Plaintiff had 100 percent oxygen saturation on room air. *Id.* She prescribed Azithromycin, Symbicort, and Albuterol and referred Plaintiff to a pulmonary clinic. *Id.* Plaintiff called the office later to indicate he was allergic to Azithromycin and to request another medication. *Id.* The provider indicated Plaintiff should discontinue the Azithromycin and start Doxycycline. *Id.* Lab work showed Plaintiff's cholesterol to be elevated. Tr. at 437. The provider sent a letter to Plaintiff that indicated he should increase his exercise and avoid fatty foods. *Id.*

Plaintiff underwent pulmonary function testing on May 10, 2012. Tr. at 443–46. His forced expiratory volume after one second ("FEV1") was over 100 percent without administration of bronchodilators, and the testing was considered normal. Tr. at 443. Mike Magee, CPFT, indicated Plaintiff experienced coughing and dyspnea and required several minutes rest between trials. *Id.*

On June 13, 2012, state agency consultant Anna P. Williams reviewed the record and determined that Plaintiff's diagnoses of affective disorders and anxiety-related disorders imposed no limitations on his activities of daily living ("ADLs"), social functioning, or concentration, persistence, and pace. Tr. at 112–13.

State agency medical consultant Dale Van Slooten, M.D., reviewed the record and determined Plaintiff's physical impairments to be non-severe on June 13, 2012. Tr. at 111–12.

Plaintiff followed up with Dr. Myers on August 24, 2012, and reported that his medications were helpful. Tr. at 448. On October 18, 2012, Plaintiff reported to Dr. Myers that his wife was in the hospital because of a pregnancy-related complication. Tr.

at 453. He indicated he was "more edgy." *Id.* He denied suicidal or homicidal ideations. *Id.* Dr. Myers noted Plaintiff was stable. *Id.*

On February 5, 2013, Dr. Myers noted that Plaintiff's behavior was hyperactive and that his mood was anxious and irritable. Tr. at 454. He described Plaintiff's affect as labile and his judgment/insight as limited. *Id.* He noted Plaintiff's thought content was normal. *Id.* Plaintiff indicated he was agitated by some records he reviewed from the Veterans' Administration Clinic. *Id.*

On May 16, 2013, Plaintiff reported no side effects from his medications. Tr. at 456. Dr. Myers indicated Plaintiff was cooperative; had a euthymic mood and congruent affect; had normal thought content; had fair judgment and insight; had intact orientation; and had normal concentration/memory. *Id.*

Plaintiff reported no side effects to Dr. Myers on September 11, 2013. Tr. at 458. Dr. Myers indicated the following findings on mental status examination: cooperative behavior; anxious and upset mood; affect congruent with mood; normal thought content; fair judgment/insight; intact orientation; and normal concentration/memory. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on October 9, 2013, Plaintiff testified that depression was his worst impairment. Tr. at 31. He stated he had also been diagnosed with anxiety, panic attacks, and attention deficit disorder. Tr. at 31–32. He indicated he was treated by Dr. Myers at Upstate Psychiatry. Tr. at 32. He stated he saw Dr. Myers once every two to three months

for 15 minutes to one hour at a time. *Id.* Plaintiff testified that his medications improved his symptoms and helped him to focus, but not enough to function normally. Tr. at 33. He stated he was unable to afford treatment with a counselor or other mental health provider. *Id.* He indicated his doctor prescribed medication for insomnia. Tr. at 44.

Plaintiff testified he had asthma, emphysema, chronic obstructive pulmonary disease ("COPD"), and costochondritis. Tr. at 39. He indicated he had a history of rib fracture. Tr. at 43. He stated he had problems playing with his children and performing household chores because of low energy and difficulty breathing. Tr. at 40–41. He testified that cleaning products, dust, and other chemicals caused him to have asthma attacks. Tr. at 46. He indicated he was diagnosed with degenerative joint disease in the past, but had no recent treatment for it. Tr. at 43.

Plaintiff testified he experienced anxiety and chest palpitations that necessitated him taking Xanax before leaving his home. Tr. at 33–34. He indicated he lived with his wife and three children, ages one, six, and seven. Tr. at 45. He stated he helped his wife to wash dishes and assisted her in caring for their children. *Id.* He testified that his extended family did not want to be around him because of his irritability and agitation. Tr. at 47. He indicated he lacked the attention to remain on task. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Linda Jones reviewed the record and testified at the hearing. Tr. at 50. The VE categorized Plaintiff's PRW as a cook's helper, *Dictionary of Occupational Titles* ("*DOT*") number 317.687-010, as medium with a specific vocational preparation ("SVP") of two. Tr. at 51. The ALJ described a hypothetical individual of

Plaintiff's vocational profile who was limited to light work activities; must avoid even moderate exposure to dust, fumes, odors, gases, and pulmonary irritants; must avoid concentrated exposure to extreme cold and extreme heat; was limited to simple, routine, repetitive tasks with no ongoing public interaction; and was limited to a low stress work environment, defined as involving only occasional change in work setting or decision making. Tr. at 51. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 52. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two as a mail clerk, *DOT* number 209.687-026, with 600 positions in South Carolina and 68,000 positions in the national economy; a retail trade marker, *DOT* number 209.587-034, with 3,000 positions in South Carolina and 210,000 positions in the national economy, and a packing line worker, *DOT* number 753.687-038, with 4,400 positions in South Carolina and 311,000 positions in the national economy. *Id.*

The ALJ next asked the VE to assume that a hypothetical individual of Plaintiff's vocational profile would miss at least eight hours of work during a typical workweek. Tr. at 52–53. He asked if that limitation would preclude work activity. Tr. at 53. The VE indicated that most employers would not tolerate such frequent absenteeism. *Id.*

Plaintiff's attorney asked if an individual who would be unable to sustain attention to a task for one-eighth of the workday would be able to perform the work described in response to the first hypothetical question. Tr. at 53. The VE testified that the individual would likely be unable to sustain employment. *Id.*

11

Plaintiff's attorney asked the VE to assume the hypothetical individual would miss two days of work per month. *Id.* He asked if the individual would be able to sustain work activity. *Id.* The VE testified that employers typically tolerated an average of one absence per month and that the individual would be unlikely to sustain employment. Tr. at 54.

### 2.    The ALJ's Findings

In his decision dated January 10, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since June 9, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: depression, anxiety, panic attacks, asthma, chronic obstructive pulmonary disease (hereinafter COPD), emphysema, and chostochondritis (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). I specifically find the claimant can lift or carry 20 pounds occasionally and 10 pounds frequently and he can sit, stand or walk for 6 hours, each, of an 8-hour workday. I also find that he should avoid even moderate exposure to dust, fumes, gases, odors, etc; she [sic] should even avoid moderate exposure to extreme heat or cold; and he should be limited to simple, routine, repetitive tasks with no ongoing public interaction and low stress defined as only occasional change in work setting or decision making.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on August 29, 1981 and was 30 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 9, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 12–18.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ failed to assign great weight to Plaintiff's treating psychiatrist's opinion;

2)      the ALJ presented a question to the VE that was improper because it did not include all of Plaintiff's credibly-established limitations; and

3)      the ALJ's decision is not supported by substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

13

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520,

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).
[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Treating Physician's Opinion

Dr. Myers completed a mental evaluation check-off form on September 26, 2013. Tr. at 459–63. He stated Plaintiff's impairments included major depressive disorder, recurrent; anxiety disorder; and ADHD. Tr. at 459. He identified Plaintiff's symptoms as mood disturbance, emotional disturbance, recurrent panic attacks, psychomotor agitation, difficulty thinking or concentrating, feelings of guilt/worthlessness, decreased energy, generalized persistent anxiety, hostility, and irritability. Tr. at 459–60. He stated Plaintiff experienced chronic persistent irritability and feelings of being "on edge" with episodes of depression and sadness. Tr. at 460. He specified that Plaintiff had no significant side effects from his medications. *Id.* He estimated Plaintiff's impairments or treatment would cause him to be absent from work more than three times per month. *Id.* He indicated Plaintiff could not consistently meet the time requirements of a normal workday and workweek because of emotional lability, irritability, and anxiety. Tr. at 461. He described Plaintiff as having slight restriction of ADLs; marked difficulties in maintaining social functioning; marked limitation in ability to respond appropriately to supervisors, coworkers, and the public, given the pressures in any work setting; frequent deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-like settings that may cause him to withdraw or experience exacerbation of signs or symptoms. *Id.* He indicated Plaintiff had a markedly limited ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary

17

tolerances. Tr. at 462. He indicated Plaintiff's abilities to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were moderately to markedly limited. *Id.* He stated Plaintiff was moderately limited in his abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to interact appropriately with supervisors; to follow work rules; to cope with work stresses; to behave in an emotionally-stable manner; to consistently demonstrate reliability; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. Tr. at 462–63. Dr. Myers indicated Plaintiff could manage benefits in his own best interest. Tr. at 463. He indicated Plaintiff's condition had existed and persisted with the restrictions outlined in the evaluation since at least June 9, 2011. *Id.*

Plaintiff argues that the ALJ erred in failing to accord great weight to Dr. Myers's opinion. [ECF No. 10 at 12]. He maintains Dr. Myers's opinion was supported by the other evidence of record and was not contradicted by the reports of any other treating or examining physician. *Id.* at 14.

The Commissioner argues the ALJ properly gave limited weight to Dr. Myers's opinion. [ECF No. 11 at 10]. She maintains the ALJ adequately explained why he concluded that Dr. Myers's treatment observations were inconsistent with his opinion. *Id.*

The regulations direct that ALJs accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating source's opinion is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence of record, the ALJ is not required to give it controlling weight, but must proceed to weigh the treating physician's opinion, along with all other medical opinions of record, based on the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *Id.*; SSR 96-2p. The relevant factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

The regulations also guide ALJs in weighing the criteria under 20 C.F.R. §§ 404.1527(c) and 416.927(c). A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-

acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Nevertheless, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[4] Finally, medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

ALJs are not required to expressly discuss each factor in 20 C.F.R. §§ 404.1527(c) and 416.927(c), but their decisions should demonstrate that they considered and applied all the factors and accorded each opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). This court should not disturb an ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has

---

[4] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The ALJ indicated he gave limited weight to Dr. Myers's opinion. Tr. at 17. He summarized Dr. Myers's findings from the evaluation on July 28, 2011, and noted that Plaintiff's presentation was not consistent with a finding of complete disability. Tr. at 16. He stated that Plaintiff testified he only saw Dr. Myers for 15 to 60 minutes every two to three months. Tr. at 17.

The ALJ adequately considered Dr. Myers's opinion based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). The ALJ specifically stated that he considered the supportability of Dr. Myers's opinion in his treatment notes and found that Plaintiff's presentation did not support the limitations he assessed. *See* Tr. at 16, citing Tr. at 451–52; *see also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). The undersigned's review of Dr. Meyers's records lends support to the ALJ's conclusion. *See* Tr. at 448–58 (generally indicating normal affect, positive mood, normal thought content, fair judgement and insight, intact orientation, and normal concentration and memory). The ALJ acknowledged Dr. Myers's status as an examining and treating psychiatric physician, but noted the infrequency of treatment as a factor that weighed against his opinion. *See* Tr. at 17 (noting that Plaintiff testified he only saw Dr. Myers for 15 minutes to one hour every two to three months); *see also* 20 C.F.R. §§ 404.1527(c)(1), (2), (5), 416.927(c)(1), (2), (5). The ALJ cited other evidence earlier in the opinion that was inconsistent with Dr. Myers's opinion, including Plaintiff's self-reported ADLs and Dr. Weikle's observations.

*See* Tr. at 14 (noted to be moving a freezer; able to dress himself and care for personal needs such as bathing, caring for his hair, shaving, feeding himself, and using the toilet; needs no special reminders for his personal care; drives short distances and rides in a car; can count change, handle a savings account, and use a checkbook; spends time talking with others; goes to doctor's appointments; no problems getting along with family, friends, or neighbors; can follow written and oral instructions; has never been fired or laid off because of problems getting along with others); Tr. at 15–16 ("the claimant was noted to be able to articulate well with normal speech/language, rate, volume and coherence; thought content normal with ability to perform basic computations and apply abstract reasoning; associations are intact; no evidence of hallucinations, delusions, obsessions or homicidal/suicidal ideation; demonstrates appropriate judgment and insight; displays ability to recall recent and remote events and fund of knowledge is intact and attention span; and his ability to concentrate is normal (Exhibit 4F)")[5]; *see also* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). A review of the decision as a whole reveals that the ALJ considered all the relevant factors and that his decision to accord limited weight to Dr. Myers's opinion was supported by substantial evidence.

### 2.    Hypothetical Question Presented to VE

Plaintiff argues the ALJ failed to pose an adequate hypothetical question to the VE because he did not include all of the limitations that were established by the evidence.

---

[5] Dr. Weikle last observed Plaintiff's mental status in September 2009, which was prior to his alleged disability onset date. *See* Tr. at 368. However, because the record only contains observations of Plaintiff's mental status from Dr. Myers and Dr. Weikle, it was not unreasonable for the ALJ to consider Dr. Weikle's observations in assessing the consistency of Dr. Myers' opinion with the other medical evidence of record.

[ECF No. 16 at 10]. He maintains the ALJ omitted difficulty thinking and concentrating; decreased energy; work absences of more than three days per month; an inability to meet the time requirements of a normal workweek; marked difficulty maintaining social functioning; marked limitation in interaction with supervisors, coworkers, and the public; frequent deficiencies in concentration, persistence, or pace that resulted in a failure to timely complete tasks; marked limitation in performance of work activities on a schedule; and marked limitation in punctuality. *Id.* at 16–17.  Plaintiff contends the ALJ improperly relied upon the jobs identified by the VE to conclude he was capable of performing other work. *Id.* at 17.

The Commissioner argues that Plaintiff carried the burden to prove his work-related limitations. [ECF No. 11 at 6]. She maintains the RFC assessed by the ALJ was consistent with, but more restrictive than that suggested by the state agency medical consultants. *Id.* at 7. She further contends the ALJ's RFC assessment was consistent with the objective medical evidence. *Id.* at 8.

At step five of the sequential evaluation process, the Commissioner bears the burden of showing that the economy contains a significant number of jobs that the claimant could perform. *Walls*, 296 F.3d at 290. The purpose of bringing in a VE is to assist the ALJ in meeting this requirement. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). In order that the VE's opinion may be relevant, "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also*

*English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

Plaintiff's second argument is essentially a recitation of his first argument in that he argues the ALJ erred in failing to include in the hypothetical question to the VE the limitations specified in Dr. Myers's opinion. *Compare* ECF No. 16 at 16–17, *with* Tr. at 459–63. As discussed above, the ALJ adequately supported his decision to find that Plaintiff was not limited to the extent Dr. Myers indicated in his opinion. Because the record does not establish the additional limitations Plaintiff alleges, the undersigned recommends the court find no error in the ALJ's framing of the hypothetical question to the VE or in his reliance on the jobs the VE identified.

### 3.     Substantial Evidence

Plaintiff argues the ALJ failed to meet the agency's burden of proof to show that he could perform other work that existed in the economy. [ECF No. 16 at 18]. He maintains his mental limitations and inability to perform repetitive reaching, handling, and lifting of objects weighing up to 20 pounds precluded him from performing the jobs identified in the ALJ's decision. *Id.* at 19. He contends the ALJ improperly relied upon his failure to stop smoking and his sporadic medical treatment to support the decision. [ECF No. 12 at 2].

The Commissioner argues that substantial evidence supported the ALJ's decision that Plaintiff could perform a range of light work. [ECF No. 11 at 6]. She maintains the ALJ based his decision on several medical opinions, the unremarkable objective medical evidence, Plaintiff's drug-seeking behavior, the sporadic and conservative treatment regimen, and Plaintiff's noncompliance with treatment recommendations. *Id.*

The ALJ identified Plaintiff's severe impairments as depression, anxiety, panic attacks, asthma, COPD, emphysema, and costochondritis. Tr. at 12. He determined Plaintiff's impairments did not meet or equal a Listing. Tr. at 13–14. He indicated Plaintiff could perform work that required he lift 20 pounds occasionally and 10 pounds frequently and sit, stand, and walk for six hours each during an eight-hour workday. Tr. at 15. He indicated Plaintiff should not be exposed to even moderate dust, fumes, gases, odors, etc. or to extreme heat or cold. *Id.* He limited Plaintiff to simple, routine, and repetitive tasks that involved no ongoing public interaction and that were low stress, which he defined as involving only occasional change in work setting or decision making. *Id.* The ALJ explained that he accounted for Plaintiff's depression, anxiety, and panic attacks by limiting him to simple, routine, repetitive tasks. *Id.* He stated he limited Plaintiff to light work based on his costochondritis. *Id.* He indicated he accounted for Plaintiff's pulmonary problems by finding he should avoid exposure to pulmonary irritants and to extreme heat and cold. *Id.* He explained that the RFC he assessed was consistent with Plaintiff's medical records and proceeded to summarize the medical evidence. Tr. at 15–16. He considered Plaintiff's credibility and found that, although Plaintiff's impairments could reasonably be expected to cause the alleged symptoms,

Plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible. Tr. at 16. The ALJ based his determination regarding Plaintiff's credibility on the medical evidence, the presence of normal pulmonary function tests, and Plaintiff's noncompliance with his physicians' orders to stop smoking. *Id.* He explained his reasons for giving limited weight to Dr. Myers's opinion. Tr. at 16–17. Finally, he relied upon the VE's testimony to conclude Plaintiff was capable of performing jobs that existed in significant numbers in the economy and was, therefore, not disabled. Tr. at 17–18.

The undersigned recommends the court find the ALJ's decision to be supported by substantial evidence. Although Plaintiff argues he was unable to perform the jobs identified in the ALJ's decision because they involved repetitive reaching, handling, and lifting of objects weighing up to 20 pounds, Plaintiff cites no specific evidence of record to suggest he is unable to lift up to 20 pounds or to perform repetitive reaching or handling. The ALJ accommodated Plaintiff's mental impairments by limiting him to simple, routine, and repetitive tasks in a low-stress work environment that involved no ongoing public interaction. *See* Tr. at 15–16. He explained that he did not assess the additional mental limitations specified by Dr. Myers because they were not supported by the evidence of record. *See* Tr. at 16–17.

The ALJ noted that he considered Plaintiff's testimony regarding the frequency of his treatment and the length of his visits with Dr. Myers in considering Dr. Myers's opinion. Pursuant to 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), ALJs should consider "the frequency of examination" and the "nature and extent of the treatment

26

relationship." Therefore, the ALJ's consideration of the frequency of his visits with Dr. Myers and the extent of the treatment relationship were relevant to evaluation of Dr. Myers' opinion. The ALJ did not cite Plaintiff's sporadic medical treatment in discounting his credibility. Therefore, Plaintiff's argument that he was penalized for his inability to afford medical treatment is without merit.

The undersigned recommends the court find the ALJ did not err in considering Plaintiff's noncompliance with his physicians' orders to stop smoking. In *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984), the Fourth Circuit held that the Commissioner could only "deny the claimant benefits because of alcohol or tobacco abuse if [he] finds that a physician has prescribed that the claimant stop smoking or drinking and the claimant is able to voluntarily stop," However, in *English v. Shalala*, 10 F.3d 1080, 1084 (4th Cir. 1993), the court explained that a failure to follow prescribed treatment may be considered as a factor in evaluating an individual's credibility. In *Massey v. Astrue*, 0:11-2251-MGL, 2013 WL 178369, at *7 (D.S.C. Jan. 17, 2013), this court distinguished consideration of an individual's failure to stop smoking as part of the credibility assessment from a denial of benefits based solely on the individual's failure to stop smoking. The court explained that ALJs were permitted to consider an individual's failure to comply with medical directives to stop smoking as part of the credibility analysis without developing the record as to the individual's reasons for failing to comply with the doctors' orders. *Massey*, 2013 WL 178369, at *7; *see also Williamson v. Colvin*, No. 8:12-2887-JFA-JDA, 2014 WL 1094404, at *14 (D.S.C. Mar. 18, 2014) ("With respect to the ALJ's conclusion regarding Plaintiff's continued smoking, i.e., that it goes

against medical advice and makes Plaintiff's claims of disabling limitations less credible, such conclusion is appropriate under the present case law and is supported by substantial evidence."). Here, the ALJ considered Plaintiff's failure to follow his doctors' orders to stop smoking as one of several factors that discounted his credibility. *See* Tr. at 16 (finding Plaintiff's statements were not entirely credible based on the medical evidence, normal pulmonary function tests, and noncompliance with physicians' recommendations to stop smoking). A review of the record shows that Plaintiff was repeatedly urged to stop smoking and that Dr. Weikle specifically indicated in his records that it was "key" that Plaintiff stop smoking for "lung disorder prevention." *See* Tr. at 300, 304, 362, 364, 366, 367, 370, 399, 415. In light of the evidence of record, the undersigned recommends the court find the ALJ appropriately considered Plaintiff's failure to follow medical advice to stop smoking as one of several factors that reduced his credibility.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

February 9, 2016                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).